Rosa Lee Tucker YOUNG,
Claimant–Appellant,

v.

AMAX LEAD COMPANY OF MISSOURI, Employer–Respondent.

No. 16411.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 21, 1989.

**154**

Raymond E. Whiteaker, Lee Ann Miller, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for claimant-appellant.

J.B. Schnapp, Schnapp, Graham, Reid & Fulton, Fredericktown, for employer-respondent.

MAUS, Judge.

Lloyd Young (claimant) filed a claim for disability resulting from chronic lead intoxication. The incidence of the occupational disease was alleged to be March 13, 1982. The self-insured employer is Amax Lead Company of Missouri (AMAX). Following an extensive hearing, the Administrative Law Judge made detailed and careful findings of fact and denied compensation. The Labor and Industrial Relations Commission adopted the findings and rulings of law of the Administrative Law Judge and affirmed the denial of compensation. While the appeal has been pending, the claimant died. His widow, Rosa Lee Tucker Young, has been substituted. § 287.230.

A sketch of the factual background follows. Claimant started working for AMAX in November 1969 when he was 50 years old. For one month he cleaned furnaces. For one year he worked in the yard. In 1971, he worked in the change house. From January 1977 to the termination of his employment, the claimant worked as a lunch room attendant.

In February 1980, the claimant complained of "upper epigastric and chest discomfort with diminished appetite for about two months." The physician who examined the claimant at the request of AMAX found no evident plumbism (lead poisoning or intoxication). He concluded there was possible gastroenteritis or chest discomfort of undetermined etiology. In 1980, claimant was operated on for chronic cholecystitis and cholelithiasis and appendicitis. In March 1981, claimant was again examined by a physician at the request of AMAX. The physician noted that claimant was complaining of persistent frontal cephalgia. The physician found no evidence of plumbism and that the claimant had possible chronic sinusitis.

On March 13, 1982 (the day of the alleged incident of the occupational disease), the claimant was seen in the emergency room of Salem Memorial District Hospital. His complaints were abdominal pain with vomiting and weakness. His pulse was 54, respiration 16, and blood pressure 230/124. He was transferred to St. John's Regional Health Center. He was a patient until March 26, 1982. His treating physician was Duane C. Hellam, M.D. The discharge diagnoses were: 1. Chronic lead intoxication. 2. Hypertensive crisis. 3. Nephropathy. 4. History of appendectomy and cholecystectomy for abdominal pain.

To sustain the claim of chronic lead intoxication, the claimant relied upon the following: Evidence that during the course of his employment, he was exposed to excessive levels of lead. Claimant's blood lead levels were consistently at or above 40. The claimant's hypertension made him more susceptible to lead poisoning than the average person. He emphasized the onset and course of his symptoms. The claimant ultimately relied upon the opinion of Dr. Hellam that he was suffering from chronic lead poisoning as a result of his employment.

On the other hand, the factors upon which the employer relied to defeat the claim include the following: Evidence that

the employee was not consistently exposed to excessive levels of lead. During the course of his employment, claimant was tested for his blood lead level 31 times, along with the blood lead level testing of other employees. Claimant's blood lead level was consistently one of the lowest levels of all the random employees tested. Of 37 blood lead level tests performed upon claimant, only one was above 50, the standard set by OSHA. On March 8, 1982, his blood level was 36. The fact that the claimant did not have symptoms or conditions associated with chronic lead poisoning, such as anemia and the dysfunction of both kidneys, as distinguished from only one kidney. The employer also emphasizes the family history of the claimant. That history reveals that his mother died at the age of 40 from high blood pressure; a sister died at age 35 to 40 with high blood pressure; another sister died at age 52 with high blood pressure and myocardial infarction; and that six brothers all died of heart attacks between the ages of 48–70.

The employer discredits the opinion of Dr. Hellam. Employer argues that Dr. Hellam had seen only one case of lead intoxication, he did not take blood level tests during claimant's hospitalization, and the urine test upon which he relied was not administered according to the accepted protocol. The employer also points out that the report of the nephrologist consulted by Dr. Hellam did not conclude that the claimant was suffering from chronic lead poisoning. Rather, the report stated that the lead mobilization tests done on the claimant were not compatible with excessive body lead burden and that the nephrologist was concerned with the high grade level of proteinuria which was not typical for lead nephropathy.

Finally, the employer presented an abundance of medical evidence to establish the claimant was not suffering from chronic lead poisoning. Martin Davis, M.D., examined the claimant and records of his hospitalizations. Dr. Davis presented an extensive background of forty years' experience in the diagnoses and treatment of chronic lead intoxication. He cited the results of many tests and findings upon which he relied. Dr. Davis concluded that the claimant was not suffering from lead intoxication or excessive lead absorption at the time of his examination or at any time in the past, that he had hypertension and minimal renal function related to hypertension and that the claimant did not have any disability related to his occupation.

Sidney Lerner, M.D., examined the records of all St. John's hospitalizations of claimant and the report of Dr. Davis. Dr. Lerner was a board certified physician in occupational medicine since 1965. He had extensive experience in the diagnosis and treatment of lead cases. Dr. Lerner noted many findings reflected in the records. He found no findings that would permit a diagnosis of lead intoxication or excessive body burden of lead. He noted findings that indicated the claimant was not suffering from such conditions. He concluded that claimant was not suffering from the alleged occupational disease.

Harvey Gonick, M.D., was a diplomat of the American Board of Internal Medicine and Nephrology. He obtained from St. John's the TC–99m DTPA renal blood flow and static renal images as well as I–131 hippuran imaging with renogram tracings. As a result of his examination of those tests, Dr. Gonick concluded:

"The evidence is strongly against Mr. Young having lead-related nephropathy and more in keeping with his having a form of nephrosclerosis, possibly related to renovascular hypertension."

Dr. Gonick's findings were confirmed by Doina Tanasescu, M.D., a diplomat of the American Board of Nuclear Medicine, to whom Dr. Gonick had referred the studies.

As stated, the Administrative Law Judge made extensive and careful findings analyzing and evaluating the evidence. In evaluating the medical evidence the claimant tendered in support of his claim, the Administrative Law Judge made the following significant findings:

"I find employee's medical evidence lacked the preciseness necessary to establish a causal connection between employee's condition and his employment.

I further find employee's medical evidence was contradicted by Doctors Davis, Lerner, Carnett, Gonick, Rosen and Tanasescu, to such a degree it fails to support his claim of occupational disease."

The ultimate findings and rulings of the Administrative Law Judge were that under all the credible evidence the claimant did not contract an occupational disease arising out of and in the course of his employment with AMAX and that his disabilities were not causally related to such employment. Also, as stated, the Findings of Fact and Rulings of Law of the Administrative Law Judge were adopted by the Labor and Industrial Relations Commission.

"Conflicts in the evidence and the credibility of witnesses are matters for resolution by the commission.... [T]he commission was not compelled to believe [the claimant's] testimony and was at liberty to reject all or any part of it which it did not consider credible." *Massengill v. Ozark Action, Inc.*, 762 S.W.2d 850, 851 (Mo.App. 1989). This court must "defer to the fact findings of the commission when supported by substantial evidence on the record as a whole." *Martin v. Mid–America Farm Lines, Inc.*, 769 S.W.2d 105, 107 (Mo. banc 1989).

It is obvious there is substantial medical evidence to support the final award of the Commission denying compensation. That denial is affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.